UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>WILLIAM KENT MADDOX,<br><br>        Defendant. | Criminal No. 05-99-HA<br><br>OPINION AND ORDER |

HAGGERTY, Chief Judge:

      On or about February 11, 2001, defendant William Kent Maddox (defendant or Maddox) allegedly removed two children (W.T.M. & R.M.M.) from the United States with the intent to obstruct Kadriye G. Maddox's lawful exercise of parental rights. A Grand Jury issued an indictment on March 9, 2005, charging defendant Maddox with one count of violating the International Parental Kidnaping Crime Act (IPKCA), 18 U.S.C. § 1204. Defendant Maddox filed eight pre-trial motions in the instant case [26, 27, 28, 30, 32, 34, 35, 36]. This court heard

1 -- ORDER

oral argument regarding the motions on February 21, 2006. During oral argument, the government conceded that it would comply with seven of the eight motions filed by defendant.[1] Accordingly, those motions are GRANTED. This court has considered the parties' submissions and arguments regarding defendant's Motion to Dismiss Indictment [30]. For the reasons discussed below, defendant's Motion to Dismiss Indictment is DENIED.

**BACKGROUND**

Defendant Maddox met Kadriye Gunaydin (Kadriye) in 1993, while he was employed as a teacher in Istanbul, Turkey. The two were married in Istanbul on September 7, 1993. At the time of their marriage, Maddox was 46 years of age and Kadriye was 29 years of age. In June of 1994, Maddox and Kadriye left Turkey due to the country's economic crisis that resulted in Maddox losing his teaching job. Maddox and Kadriye arrived in Portland, Oregon in September of 1994. In December of 1994, their first child (W.T.M.) was born. Their second child (R.M.M.) was born on November 20, 1997.

Prior to and after the birth of their children, Maddox observed what he viewed as somewhat erratic, paranoid and occasionally violent behavior by Kadriye. In January of 1996, Maddox and Kadriye were contacted by a Child Services Division case worker responding to reports that Kadriye had been striking their son W.T.M.. Kadriye denied ever striking W.T.M.. As a result of Kadriye's behavior, Maddox sought and obtained three restraining orders. The first two restraining orders were issued on April 4, 1994 and January 10, 2000, respectively. The third restraining order was issued on November 8, 2000. All restraining orders were eventually

---

[1] The motions were filed under the following docket numbers: [26, 27, 28, 32, 34, 35 & 36].

vacated.

From 1996 to 2000, Kadriye sporadically sought psychological counseling and medication therapy to regulate her behavior. According to defendant, Kadriye still displayed the same erratic and violent behavioral patterns towards Maddox, and others who she perceived as a threat to her, during this time period. Her behavior resulted in a misdemeanor assault charge in Fairbanks, Alaska[2] while Maddox held a teaching position there. Kadriye's behavior also resulted in Maddox losing a teaching position in the St. Mary's School District in Alaska. In February of 2000, Maddox initiated marriage dissolution proceedings in which he sought full physical and legal custody of his two minor children. Kadriye opposed Maddox's request for custody of the minor children.

Upon completing a court-ordered evaluation of the Maddox family, Rose Mary Lyons, a Marriage and Family Counselor employed by Multnomah County Family Court Services, recommended that Maddox retain custody of the children with supervised visitation by Kadriye.

Maddox obtained a job offer to teach fifth grade in Monroe, North Carolina in August of 2000. In order to travel to the position, Maddox entered into a formal Parenting Plan with Kadriye, whereby Maddox retained sole legal and physical custody of the children subject to Kadriye's right of parenting time. This plan replaced all previous custody agreements and stated that a new plan would be negotiated following the summer of 2001. The job offer in North Carolina was later withdrawn and Maddox returned to Portland shortly thereafter to find employment.

---

[2] This charge was eventually dropped after the Maddox family returned to Portland, Oregon from Fairbanks, Alaska. The charge resulted from Kadriye striking Maddox.

3 -- ORDER

In November of 2000, Maddox filed and obtained the third restraining order as a *pro se* plaintiff against Kadriye fearing that she might attempt to take the children from him. This order was later vacated by Multnomah County Circuit Court Judge Elizabeth Welch following a December 4, 2000 hearing. After this hearing, a temporary restraining order (TRO) was filed (dated December 21, 2000) in the primary dissolution of marriage case. The TRO did not recognize Maddox as the sole custodian of the children. Moreover, the TRO enjoined both parties from changing the children's usual place of residence. The children were residing in the Portland Metropolitan Area at the time the TRO was issued.

On February 15, 2001, Kadriye went to Maddox's apartment and was advised by Maddox's father that he and the children had gone on a trip. On February 21, 2001, Maddox advised his daughter from a previous marriage that he and his minor children were living in the province of Chongquing in the People's Republic of China, where he had assumed a teaching position at a local university. Subsequently, Maddox corresponded with Kadriye by phone and e-mail and provided her with a mailing address.

On April 9, 2001, the Multnomah County District Attorney's Office (MCDA) filed criminal charges against Maddox alleging that he had committed the crime of custodial interference in the first degree, in violation of O.R.S. § 163.257. On January 22, 2004, Maddox sought to contact the MCDA to resolve the situation. In January of 2005, Maddox moved from China to Malaysia in order to commence a new teaching job. On March 9, 2005, Maddox was indicted by the Grand Jury for the District of Oregon in the instant matter, and a warrant for his arrest was issued.

As a consequence of the indictment, Maddox's passport was revoked by the State

4 -- ORDER

Department. On May 12, 2005, Maddox was taken into custody by the Royal Malaysian Police and handed over to Federal Bureau of Investigation agents, who transported him to Guam where he was arraigned.

## DISCUSSION

Defendant Maddox moves this court to dismiss the current indictment based upon three grounds. First, the defendant argues that the indictment should be dismissed based on pre-indictment delay in violation of his Due Process Rights under the Fifth Amendment. Second, the defendant contends that the indictment should be dismissed because, as written, 18 U.S.C. § 1204(a)'s removal prohibition penalizes both "unlawful removals" and "lawful removals" which exceeds the power given to Congress under the Commerce Clause to regulate the misuse of channels of commerce. Finally, the defendant contends that the defendant's prosecution under 18 U.S.C. § 1204(a) is unconstitutional because the facts in the instant case fail to establish a jurisdictional basis sufficient to support the exercise of legislative power pursuant to the Commerce Clause. The court addresses the defendant's second and third arguments first.

**I.     Defendant's Constitutional Challenges to 18 U.S.C. § 1204(a).**

The court finds the defendant's second argument that Congress exceeded its authority under the Commerce Clause by enacting 18 U.S.C. § 1204(a) is incorrect. The Ninth Circuit has recently recognized the Congressional authority under the Commerce Clause to enact and enforce the IPKCA. *See, United States v. Cummings*, 281 F.3d 1046, 1050 (9th Cir. 2002) (holding that "Congress can act to prohibit the transportation of specified classes of persons in foreign commerce"). Therefore, Maddox's prosecution under the statute is constitutionally valid.

Maddox's third argument regarding the lack of a jurisdictional basis sufficient to exercise legislative power under the Commerce Clause is likewise misplaced.  In *Cummings*, the Ninth Circuit further acknowledged that the IPKCA inherently contains a jurisdictional element which ensures that wrongfully retained children must pass through the channels of foreign commerce. 218 F.3d at 1051.  Here, the government squarely charges Maddox with taking his children out of the United States using the channels of foreign commerce, in violation of the IPKCA.  Thus, the current indictment satisfies the constitutionally required jurisdictional element in this case. Additionally, the government has presented facts establishing that Maddox's actions violated a Temporary Restraining Order that was in place prior to his departure from the United States. These facts run contrary to the defendant's argument that he had legal custody of his children before departing to China and, thus, did not unlawfully remove the children from the United States.

## II.     Fifth Amendment Due Process Claim.

### Pre-indictment Delay.

The defendant argues that the government's delay has significantly hampered his ability to locate and contact witnesses.  Moreover, the defendant contends that witnesses who would have been capable of providing exculpatory information can no longer do so as a result of their "dimming" memories.  Defendant submits one declaration (Maddox Decl.) to support the motion in which he claims that the testimony of three witnesses might no longer be available due to failed memory.  Maddox Decl. at 3.  For the following reasons, the court finds that the defendant cannot meet his burden to establish a due process violation based on pre-indictment delay.

The Fifth Amendment guarantees against excessive pre-indictment delay.  U.S. Const.

Amend. V.  In pertinent part, Federal Rule of Criminal Procedure 48(b) provides that the court may dismiss an indictment "if unnecessary delay occurs in: (1) presenting a charge to a grand jury [after arrest] . . . or (3) bringing a defendant to trial."  The Supreme Court and the Ninth Circuit have established a two-prong test for determining if pre-indictment delay has risen to the level of a denial of due process.  *United States v. Moran*, 759 F.2d 777, 780 (9th Cir. 1985); *see also United States v. Sherlock*, 962 F.2d 1349, 1353 (9th Cir. 1989).  First, the defendant must establish that "actual prejudice" occurred from the delay.  *United States v. Barken,* 412 F.3d 1131, 1134 (9th Cir. 2005).  Secondly, even if the court finds actual prejudice, the prejudice must, when balanced against the government's reasons for the delay, "offend those fundamental conceptions of justice which lie at the base of our civil and political institutions."  *Sherlock*, 962 F.2d at 1353-1354 (citations and quotations omitted).

      The Ninth Circuit has expressly acknowledged that a defendant bears a heavy burden to establish that pre-indictment delay caused actual prejudice to the defendant's ability to defend himself against the charges in question.  *Barken*, 412 F.3d at 1134;  *see also United States v. Martinez*, 77 F.3d 332, 335 (9th Cir. 1996).  The proof of actual prejudice must be definite and not speculative.  *Id*. (citing *Sherlock*, 962 F.2d at 1353-54).  The defendant must submit proof that demonstrates "exactly how the loss of a witness and or evidence is prejudicial."  *Barken*, 412 F.3d at 1134.  Moreover, statutes of limitation, not the due process clause, generally protect defendants against pre-indictment delay.  *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992).

      There is insufficient evidence in the record that the delay between Maddox's alleged

violation of the IPKCA and the government's indictment caused such a loss of testimony or evidence as to reach the heightened burden of prejudice necessary to find a violation of due process under the Fifth Amendment. Here, the indictment charges a crime which occurred on February 11, 2001. The indictment, however, was returned within the statute of limitations on March 9, 2005. The crux of defendant's argument in favor of pre-indictment delay is his own declaration which references three particular witnesses who assert that their memories have dimmed over time. Particularly, defendant contends that Ms. Sharon Bullias, Ms. Nancy Slavin and Ms. Judy Hager are unable to recall certain events about which they had previously testified because of their dimming memories.

Defendant claims that the government's delay has led to the witnesses' inability to recall the past events in question. As a result, the defendant contends that his ability to raise an affirmative defense recognized under 18 U.S.C. § 1204(c)(2) has been impaired. The court notes, however, that transcripts exist detailing the testimony of two of the three witnesses specified in the defendant's declaration. Such transcripts could undoubtedly be utilized to refresh the recollection of the those witnesses in question as well as any other witnesses who may have testified on behalf of the defendant in prior custodial and or marriage dissolution proceedings. In addition to the third witness for whom no transcripts exist, the defendant generally claims that similar statements have been made by other witnesses whose memories have dimmed with the passage of time.

Defendant's evidence proves insufficient to satisfy the high burden required under *Sherlock*. Defendant fails to show that the dimming of memories resulted from culpability on the part of the government. *See Sherlock,* 962 F.2d at 1355. Specifically, the defendant proffers

no evidence to establish that the government's delay was undertaken intentionally or solely to gain a tactical advantage over the defendant. *Id.* (citations and quotations omitted). Moreover, the defendant's evidence does not establish that the witnesses' recollection would have been unaltered had the government sought the indictment within an earlier time frame.

Assuming, however, that the defendant was able to show that the delay resulted in the loss of pivotal testimony, the court is still compelled to find that defendant's evidence falls short of establishing actual prejudice. *See United States v. Ross*, 123 F.3d 1181, 1186 (9th Cir. 1997) (finding that defendant failed to establish actual prejudice, despite a delay of over four years, the death of four potential witnesses, and the alleged memory loss of two potential witnesses); *see also Barken*, 412 F.3d at 1135 (finding that the defendant failed to show actual prejudice, despite a delay of five years, the death of a potential witness, the loss of another witness due to his relocating to another country, the destruction of potentially exculpatory evidence, and the destruction of the physical evidence at issue).

Aside from his scant declaration, defendant proffers no evidence that any pre-indictment delay has unfairly impaired his ability to defend himself. Accordingly, the court finds that defendant's alleged prejudice does not reach the level implicating a violation of the Due Process Clause. Since the court finds that the defendant fails to adequately establish prejudice, it is unnecessary to reach the question of whether the delay offended fundamental conceptions of justice. *See United States v. Manning*, 56 F.3d 1188, 1194 (9th Cir. 1995).

///
///

9 -- ORDER

**CONCLUSION**

For the foregoing reasons, the defendant's Motion to Dismiss Indictment [30] is DENIED.

IT IS SO ORDERED.

Dated this __2__ day of May 2006.

                                               /s/ Ancer L. Haggerty
                                                 ANCER L. HAGGERTY
                                            United States District Judge